**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Allen Skillicorn, | No. CV-24-01074-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Ginny Dickey, et al., | |
| Defendants. | |

Pending before the Court is a motion for preliminary injunction filed by Allen Skillicorn ("Plaintiff"). (Doc. 6.)  The motion is fully briefed (Docs. 24, 28) and the Court concludes it may be resolved without an evidentiary hearing.[1]  For the reasons that follow, the motion is denied.

## BACKGROUND

I.    The Complaint

The Court will begin by providing a summary of the allegations in the complaint. (Doc. 1.)  Because the complaint is not verified, it would ordinarily be insufficient, on its

---

[1]     Plaintiff argues that an "evidentiary hearing is unnecessary" because the parties' submissions reveal the existence of only immaterial factual disputes.  (Doc. 28 at 3.)  The Court agrees that an evidentiary hearing is unnecessary under these circumstances.  *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986) (evidentiary hearing unnecessary both because the appellant "never requested" one and because "some facts [were] in dispute, but the real problem involve[d] the application of correct substantive law to those facts"); 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 65 (2024) ("Rule 65(a) . . . does not always require a live hearing, and courts sometimes rule based on the parties' paper submissions, such as when the issues are strictly legal or the facts are not in dispute.").

own, to support a grant of preliminary injunctive relief.  *See, e.g., K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) ("A verified complaint or supporting affidavits may afford the basis for a preliminary injunction . . . ."); *Doe #11 v. Lee*, 609 F. Supp. 3d 578, 592-93 (M.D. Tenn. 2022) ("Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations.") (citations omitted).  However, as Plaintiff correctly notes in his reply (Doc. 28 at 3), the parties' evidentiary submissions largely corroborate the factual allegations in the complaint and reveal that there is no significant disagreement over the material facts here—rather, the disagreement is over the legal significance of those facts.

A. **The Parties**

Plaintiff is an elected member of the Fountain Hills Town Council ("Town Council").  (Doc. 1 ¶ 1.)

Defendants Brenda J. Kalivianakis ("Councilwoman Kalivianakis"), Sharon Grzybowski ("Councilwoman Grzybowski"), and Peggy McMahon ("Councilwoman McMahon") are also elected members of the Town Council.  (*Id.* ¶¶ 3-5.)

The fourth Defendant, Ginny Dickey ("Mayor Dickey"), is the mayor of Fountain Hills.  (*Id.* ¶ 2.)  The materials attached to the complaint explain that "the Mayor . . . is the Presiding Officer of all meetings of the [Town] Council" and serves as one of the members of the Town Council.  (*Id.* at 23 § 1.2, 24 § 2.4.)

The fifth Defendant, Tina Vannucci ("Attorney Vannucci"), is a "private attorney" who was retained by Fountain Hills to perform certain investigations.  (*Id.* ¶¶ 6, 16.)

The sixth Defendant, the Town of Fountain Hills ("Fountain Hills"), "is a municipal corporation in the State of Arizona."  (*Id.* ¶ 7.)

B. **The First Ethics Complaint**

Fountain Hills "has an . . . Ethics Code."  (*Id.* ¶ 13.)[2]  "Any person who believes a

---

[2]    The "Rules of Procedure" of the Town of Fountain Hills are attached as Exhibit 1 to the complaint.  (*Id.* at 22-54.)  The "Code of Ethics" is set forth in § 8 of this document.  (*Id.* at 44-47.)  The "Code of Ethics-Complaint Procedure" is set forth in § 10 of this

- 2 -

Council Member . . . has violated the Code of Ethics . . . may file a complaint." (*Id.* at 53 § 10.)  "In 2023 and 2024, a series of ethics complaints were submitted to the Town of Fountain Hills alleging certain ethics violations by [Plaintiff]." (*Id.* ¶ 12.)  These complaints were "submitted by political opponents of [Plaintiff]." (*Id.*)

The first relevant complaint "involved an allegation that [Plaintiff's] speech at a January 17, 2024, Town Council meeting violated the [Town's] Ethics Code." (*Id.* ¶ 19.) "Pursuant to the Ethics Code, upon receipt of" this complaint, "the Town secured outside counsel," Attorney Vannucci, "to conduct an investigation." (*Id.* ¶¶ 15, 16.)

The complaint alleges that Attorney Vannucci "proceeded to conduct a sham investigation." (*Id.* ¶ 18.)  At the conclusion of the investigation, Attorney Vannucci "sustain[ed]" the ethics complaint and provided a report to the Town Council that summarized her findings. (*Id.* ¶¶ 18, 20.)[3]  The report described Plaintiff's unethical conduct as (1) stating that he was "concerned or curious about whether any members of [the Town Council] have been lobbied or had ex-parte communications with" a real estate developer and/or had "taken campaign cash from the developer"; (2) suggesting that the Town Council was "rushing" its consideration of a particular zoning issue with "no transparency"; (3) asserting that Councilwoman McMahon "is against transparency"; and (4) raising "rumors of people talking to developers." (*Id.* ¶ 21.)  The report concluded that this conduct violated sections 8.4, 8.4(A), and 8.6(B) of the Ethics Code. (*Id.* ¶ 22.)  The report also contained a passage concluding that the First Amendment would not prevent the Town Council from sanctioning Plaintiff for his remarks. (*Id.* ¶ 23.)  According to the complaint, the report "failed to discuss legislative or speech and debate privilege at all," "failed to note that the law in the Ninth Circuit is that the legislative privilege to speak freely at a council meeting extends to municipal officeholders," and "failed to mention that under Arizona law," town council members have absolute immunity for statements during a formal council meeting. (*Id.* ¶¶ 27, 28.)

_____

document. (*Id.* at 53-54.)

[3]      This report is attached as Exhibit 2 to the complaint. (*Id.* at 55-59.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.     The Second Ethics Complaint

The second relevant ethics complaint "stemmed from an interaction between [Plaintiff], Town employee Peter Luchese and a Maricopa County Sheriff's Deputy . . . on or about September 16, 2023." (*Id.* ¶ 30.)[4]

The background for this incident was as follows.  Plaintiff opposed a certain bond measure that Mayor Dickey supported.  (*Id.* ¶ 31.)  In an effort to advance his position, Plaintiff "placed various signs around the Town urging citizens to vote no on the bond measure." (*Id.*)  On or about September 16, 2023, Plaintiff witnessed a person who was "driving a Town of Fountain Hills vehicle" remove one of the signs that Plaintiff had previously installed.  (*Id.* ¶¶ 30-33.)  Believing the sign had been "illegally removed," Plaintiff pulled behind the vehicle and "attempted to make contact with the . . . driver." (*Id.* ¶¶ 33-34.)  Plaintiff also "flash[ed] his headlights at the driver, but this was in broad daylight." (*Id.* ¶ 35.)  Plaintiff then "followed" the other car "to the Town of Fountain Hills governmental center, where he learned that this employee was Town code enforcement officer . . . Peter Luchese." (*Id.* ¶ 36.)

As with the other ethics complaint, the Town Council hired Attorney Vannucci to perform an investigation.  (*Id.* ¶¶ 15, 16.)  Following this investigation, Attorney Vannucci once again "sustain[ed]" the allegation and provided a report to the Town Council summarizing her findings.  (*Id.* ¶¶ 29, 40.)[5]  In the report, Attorney Vannucci concluded that Plaintiff's conduct in flashing his headlights at Luchese and then following Luchese's vehicle failed to "set[] a positive example of good citizenship as required by the Code of Ethics." (*Id.* ¶ 40, internal quotation marks omitted.)  The report also stated that Attorney Vannucci was "unable to definitively determine whether any traffic laws were in fact violated" (*id.* ¶ 37), even though Plaintiff "did not commit any traffic violations" during

---

[4]     The parties sometimes spell Luchese's last name as "Lucchese." (Doc. 24 at 13.) For sake of consistency, the Court will utilize the predominant spelling in the complaint.

[5]     Although the complaint alleges that this report is attached as Exhibit 3 to the complaint (Doc. 1 ¶¶ 37, 40), the document attached as Exhibit 3 (Doc. 1 at 60-64) is another copy of Exhibit 2, the report arising from the first investigation.  Plaintiff later submitted a copy of the report arising from the second investigation.  (Doc. 23.)

the incident and "has never been cited for any traffic violations in connection with this event." (*Id.* ¶¶ 36, 38.)

### D.   The Town Council's Issuance of Sanctions

"Pursuant to the Town Code, once a finding of an ethics violation is made, it is up to the Council to decide what sanction, if any to impose." (*Id.* ¶ 48.)  Accordingly, on March 19, 2024, the Town Council met to consider whether to impose sanctions against Plaintiff.  (*Id.* ¶ 49.)  In advance of the meeting, Plaintiff's "attorney sent the Town a letter outlining the obvious violations of the United States Constitution that had resulted by the Town's investigation and the additional violations that would occur if any discipline were attempted to be imposed by the Town Council." (*Id.* ¶ 51.)[6]

By "a 4 to 2 vote, with [Plaintiff] abstaining,"[7] the Town Council voted to impose the following four sanctions against Plaintiff: (1) Plaintiff could not be "elected" Vice Mayor;[8] (2) Plaintiff was not permitted to interact with Fountain Hills staff members without another person present; (3) Plaintiff was required to apologize to Luchese; and (4) Plaintiff could not be reimbursed for certain official travel expenses.  (*Id.* ¶ 52.)

### E.   Developments Since The March 19, 2024 Town Council Meeting

On March 29, 2024, Plaintiff was the subject of another ethics complaint, which contained allegations regarding Plaintiff's "constituent emails as well as social media posts and a radio interview." (*Id.* ¶ 57.)[9]  One of the challenged items was an email that Plaintiff sent before the March 19, 2024 Town Council meeting in which he criticized "certain members of the Town Council" and urged citizens to exercise their First Amendment

---

[6]     This letter is attached as Exhibit 5 to the complaint.  (Doc. 1 at 68-75.)

[7]     Although the complaint does not specify who cast the four votes in favor of sanctions, the minutes from the March 19, 2024 meeting reveal that the four "aye" votes were cast by Mayor Dickey, Councilwoman Kalivianakis, Councilwoman Grzybowski, and Councilwoman McMahon.  (Doc. 24-4 at 50.)

[8]     Although the complaint uses the term "elected," the materials submitted by the parties indicate that the position of Vice Mayor is not a publicly elected position.  Rather, the members of the Town Council "rotate the vice mayorship for a couple of months." (Doc. 24-4 at 45.)  Thus, the sanction precluded Plaintiff, "for the remainder of his time" on the Town Council, from being "eligible" to rotate into this position.  (*Id.*)

[9]     This ethics complaint is attached as Exhibit 7 to the complaint.  (Doc. 1 at 78-88.)

rights.  (*Id.* ¶ 58.)  This complaint has also been referred to Attorney Vannucci for investigation.  (*Id.* ¶ 59.)  However, Plaintiff has refused to meet with Attorney Vannucci to discuss the allegations, based on his view that the challenged conduct is protected by the First Amendment.  (*Id.* ¶ 61.)

On March 30, 2024, Councilwoman McMahon sent an email to Plaintiff asking him to provide a copy of his apology letter to Luchese.  (*Id.* ¶ 54.)[10]  No such letter exists, because Plaintiff believes he "owes no apology to Mr. Luchese" and "will not be apologizing to Mr. Luchese."  (*Id.* ¶ 55.)

F.    **The Claims**

Based on these factual allegations, Plaintiff asserts two claims against Defendants. In Count One, Plaintiff asserts a claim under 42 U.S.C. § 1983 for violation of his "rights to freedom of speech, freedom to petition and communicate with government officials, and right to due process and equal protection of the laws under the First and Fourteenth Amendments to the Constitution of the United States."  (*Id.* at 16.)  In Count Two, Plaintiff asserts a § 1983 claim for violation of his "right to due process and equal protection of the laws under the First and Fourteenth Amendments to the Constitution of the United States." (*Id.* at 18.)  In the prayer for relief, Plaintiff seeks, *inter alia*, "preliminary and permanent injunctions prohibiting Defendants from violating Plaintiff's rights in the future, and enjoining Defendants from imposing the 'discipline' of [Plaintiff] adopted by a majority of the . . . Town Council."  (*Id.* at 20.)

II.    Procedural History

On May 14, 2024, four days after filing the unverified complaint, Plaintiff filed the pending motion for preliminary injunction.  (Doc. 6.)  Plaintiff attached one exhibit to his motion: an excerpted portion of the minutes from the Town Council meeting on January 17, 2024.  (*Id.* at 20-37.)

On June 24, 2024, Defendants filed a corrected opposition to the motion for preliminary injunction.  (Doc. 24.)  Defendants attached 15 exhibits: (1) a photograph of

---

[10]    This email is attached as Exhibit 6 to the complaint.  (*Id.* at 76-77.)

the area where the incident on September 16, 2023 occurred (Doc. 24-1 at 1-4); (2) an ethics complaint against Plaintiff filed on December 18, 2023 (*id.* at 5-15); (3) an ethics complaint against Plaintiff filed on December 17, 2023 (*id.* at 16-21); (4) an ethics complaint against Plaintiff filed on December 26, 2023 (*id.* at 22-32); (5) bodycam footage from the incident on September 16, 2023 (*id.* at 33-34; Doc. 29); (6) a report issued by Attorney Vannucci on February 20, 2024 concluding that certain allegations against Plaintiff set forth in the ethics complaints (which related to his social media activity) were unfounded "due to the protections afforded by the First Amendment" (Doc. 24-1 at 35-41); (7) the complete minutes from the Town Council meeting on January 17, 2024 (Doc. 24-2 at 1-128); (8) an ethics complaint against Plaintiff filed on January 22, 2024 (*id.* at 129-32); (9) Attorney Vannucci's report regarding the first ethics complaint (*id.* at 133-37);[11] (10) an ethics complaint against Plaintiff filed on January 16, 2024 (Doc. 24-3 at 1-11); (11) a report issued by Attorney Vannucci on February 20, 2024 concluding that certain allegations against Plaintiff set forth in the ethics complaints (which related to social media activity) were unfounded "due to the protections afforded by the First Amendment" (*id.* at 12-18); (12) the agenda for the Town Council's meeting on March 19, 2024 (*id.* at 19-56); (13) the "Staff Report" issued following the Town Council meeting on March 19, 2024 (*id.* at 57-60); (14) the minutes from the Town Council meeting on March 19, 2024 (Doc. 24-4 at 1-93); and (15) the Town of Fountain Hills' "Rules of Procedure" (*id.* at 94-126).[12]

On June 27, 2024, Plaintiff filed a reply brief.  (Doc. 28.)  Plaintiff attached one exhibit to this brief: a May 2024 email chain between Attorney Vannucci, Plaintiff, and Plaintiff's counsel concerning Attorney Vannucci's request to interview Plaintiff in relation to the most recent ethics complaint.  (*Id.* at 13-20.)

On July 30, 2024, the Court issued a tentative ruling.  (Doc. 32.)

On August 21, 2024, the Court heard oral argument.  (Doc. 38.)

On August 27, 2024, Defendants filed an authorized supplemental brief.  (Doc. 39.)

---

[11]    As noted, Plaintiff attached a copy of this report as Exhibit 2 to the complaint.

[12]    As noted, Plaintiff attached a copy of the "Rules of Procedure" as Exhibit 1 to the complaint.

**ANALYSIS**

I.   <u>Legal Standard</u>

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up).  *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted).

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (cleaned up). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.  Regardless of which standard applies, the movant "carries the burden of proof on each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

II.   <u>The Parties' Arguments</u>

The Court will limit its analysis to the first *Winter* factor—whether Plaintiff has established a likelihood of success on the merits, or at least serious questions going to the merits—because, as discussed in later portions of this order, it is dispositive.

Plaintiff's essential argument as to the first *Winter* factor is that the conduct that gave rise to both of the sustained ethics complaints against him—first, "making comments and posing questions at an official Town Council meeting while deliberating on . . . a request to rezone a property," and second, attempting to speak to Luchese, a municipal

employee, "about the confiscation of the political sign," which "clearly implicate[s] the right to petition the government for a redress of grievances"—was protected speech under the First Amendment (and, in the former case, was also speech protected by legislative privilege).  (Doc. 6 at 6-13, emphasis omitted.)  Plaintiff also contends that the conduct underlying the latest ethics complaint against him (*i.e.,* criticizing Mayor Dickey and other Town Council members) is quintessential protected speech under the First Amendment. (*Id.* at 14-16.)  According to Plaintiff, it follows from the protected nature of his speech that Defendants are barred from "taking any action to enforce the disciplinary measures a majority of Town Council members voted to impose at the Council meeting on March 19, 2024" and/or from "taking further action on the" most recent ethics complaint.  (*Id.* at 1.) Plaintiff "seeks this Court's intervention to put a stop to the assault on his constitutional rights."  (*Id.* at 4.)

In response, Defendants argue that "[t]he Fountain Hills Town Council, as a legislative body, has the constitutional right to discipline and censure its individual Council Members.  Such discipline and sanctions do not implicate the First Amendment.  Also, censure by a town council of a council member is governmental speech, which is exempt from First Amendment scrutiny."  (Doc. 24 at 9.)  According to Defendants, the Town Council's authority to discipline and sanction its members arises not only from Arizona law but also from the "well-established . . . history dating back to the House of Commons in England and early Colonial Legislatures, that elected bodies have long had the power to discipline their own members for a variety of infractions including for objectionable speech."  (*Id.* at 11-13.)  Defendants also identify various reasons why the sanctions at issue here were permissible under the Ethics Code.  (*Id.* at 9-11.)  Finally, Defendants argue in relation to the Luchese incident that "speech is not involved but rather unacceptable conduct," as the incident did "not involve speech at all but rather [Plaintiff's] unlawful intent to stop [Luchese] by driving in an aggressive, pursuing manner and then unlawfully attempting to enter [Luchese's] vehicle to retrieve a sign he erroneously believed was stolen."  (*Id.* at 13-15.)

In reply, Plaintiff urges the Court to reject Defendants' "radical proposition that because [he] is a member of the . . . Town Council, that gives [his] political opponents on Town Council *cart[e] blanche* to control his speech and negate his right of petition." (Doc. 28 at 2.)   Plaintiff also disputes some of Defendants' factual assertions regarding the Luchese incident, albeit while emphasizing that these factual disputes do not affect the constitutional analysis and need not be resolved via an evidentiary hearing.   (*Id.* at 3-4.) Next, Plaintiff contends that the various provisions of Arizona law cited in the response brief do not support Defendants' position, because some only apply to the Arizona legislature and others only authorize the imposition of sanctions for "disorderly conduct" during a municipal council meeting.  (*Id.* at 5-6.)  Plaintiff also notes that, under the Arizona Constitution, "[n]o member of the legislature shall be liable in any civil or criminal prosecution for words spoken in debate."  (*Id.* at 6-7, citation omitted.)  Next, Plaintiff argues there is "zero support" in "federal case law" for Defendants' "contention of broad Council powers to discipline a Councilmember in a manner that impinges on otherwise constitutionally protected speech."  (*Id.* at 7-8.)  Plaintiff also seeks to distinguish the federal cases cited in Defendants' brief.  (*Id.* at 8-9.)  Finally, Plaintiff accuses Defendants of offering no defense of the investigation into the latest ethics complaint.  (*Id.* at 9-11.)

III.   Analysis

Although Plaintiff contends there is "zero support" in "federal case law" for the notion that the members of a municipal legislative body, such as the Town Council, may censure or discipline a fellow councilmember for speech that is protected by the First Amendment, Plaintiff overlooks that there is a significant body of law on this topic.

A.   **Materially Adverse Action**

The analysis in many of these cases turns on whether the plaintiff can show he was subjected to a "materially adverse action," which is one of the elements of a First Amendment retaliation claim.  For example, in *Houston Community College System v. Wilson*, 595 U.S. 468 (2022), the plaintiff, Wilson, was a publicly elected member of the nine-member Board of Trustees of the Houston Community College System ("HCC").  *Id.*

at 471.  Wilson's "tenure was a stormy one," as he "[o]ften and strongly" disagreed with his fellow board members "about the direction of HCC and its best interests" and even accused his fellow board members "in various media outlets with violating [HCC's] bylaws and ethical rules."  *Id.* at 471.  These disagreements and other incidents eventually prompted Wilson's fellow board members to vote to "censure" him and to "impose[] certain penalties" against him, including rendering him ineligible for certain board officer positions, declaring him "ineligible for reimbursement for any College-related travel," and requiring him to "complete additional training relating to governance and ethics."  *Id.* at 472.  Wilson, in turn, brought a § 1983 First Amendment retaliation claim against HCC. *Id.* at 472-73.  The Fifth Circuit rejected Wilson's claim in part, holding that he could not sue HCC over the punishments related to his "eligibility for officer positions and his access to certain funds" because he did not have an entitlement to such privileges,[13] but held that Wilson's claim against HCC could proceed as to the censure resolution.  *Id.* at 473.  The Supreme Court unanimously reversed as to the latter issue, holding:

> [W]e do not see how the Board's censure could qualify as a materially adverse action consistent with our case law.  The censure at issue before us was a form of speech by elected representatives.  It concerned the public conduct of another elected representative.  Everyone involved was an equal member of the same deliberative body.  As it comes to us, too, the censure did not prevent Mr. Wilson from doing his job, it did not deny him any privilege of office, and Mr. Wilson does not allege it was defamatory.  At least in these circumstances, we do not see how the Board's censure could have materially deterred an elected official like Mr. Wilson from exercising his own right to speak.

*Id.* at 479.  In reaching this conclusion, the Court emphasized that "elected bodies in this

---

[13]     The Fifth Circuit's analysis as to that issue was as follows: "HCC is correct that the additional measures taken against Wilson—(1) his ineligibility for election to Board officer positions, (2) his ineligibility for reimbursement for college-related travel, and (3) the required approval of Wilson's access to Board funds—do not violate his First Amendment rights.  A board member is not entitled to be given a position as an officer.  Second, nothing in state law or HCC's bylaws gives Wilson entitlement to funds absent approval.  As for travel reimbursements, we have held that a failure to receive travel reimbursement is not an adverse employment action for a public employee's First Amendment retaliation claim." *Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 499 n.55 (5th Cir. 2020).

1    country have long exercised the power to censure their members," that "censures along

2    these lines have proven more common yet at the state and local level," that there is "little

3    reason to think the First Amendment was designed or commonly understood to upend this

4    practice," that Wilson's status as "an elected official" meant he should be "expect[ed] . . .

5    to shoulder a degree of criticism about [his] public service from . . . [his] peers . . . and to

6    continue exercising [his] free speech rights when the criticism comes," and that Wilson's

7    colleagues were themselves engaging in "a form of speech . . . that concerns the conduct

8    of public office" when they voted in favor of the censure resolution.  *Id.* at 474-78.

9          This case shares several similarities with *Wilson*.  There, as here, an elected member

10   of a municipal body was censured after criticizing his fellow councilmembers, with the

11   censure accompanied by various sanctions, including being deemed ineligible for certain

12   positions and certain reimbursements.  Nevertheless, the Fifth Circuit dismissed the portion

13   of the § 1983 claim premised on the sanctions and the Supreme Court held that portion of

14   the § 1983 claim premised on the censure itself was subject to dismissal, too.

15         Plaintiff's theory of liability is also difficult to reconcile with *Blair v. Bethel School

16   District*, 608 F.3d 540 (9th Cir. 2010).  There, Blair was a publicly elected member of the

17   five-member Bethel School District School Board.  *Id.* at 542.  The board could internally

18   vote on which members would fill certain leadership positions, and the board had selected

19   Blair to serve as the vice president.  *Id.*  However, after Blair, "a persistent critic" of the

20   school district's superintendent, cast the lone dissenting vote on whether to extend the

21   superintendent's contract and then made critical comments to a newspaper reporter, the

22   other board members voted to strip him of his role as vice president.  *Id.* at 542-43.  Blair,

23   in turn, sued "the other Board members under 42 U.S.C. § 1983, alleging that he was

24   retaliated against for exercising his First Amendment rights to free speech and petition."

25   *Id.* at 543.  The district court granted summary judgment to the other board members and

26   the Ninth Circuit affirmed, explaining that although "the impetus to remove Blair as Bethel

27   School Board vice president undoubtedly stemmed from his contrarian advocacy against

28   Siegel, the Board's action did not amount to retaliation in violation of the First

Amendment." *Id.* at 546.  Among other things, the court emphasized that "the adverse action Blair complains of was a rather minor indignity, and de minimis deprivations of benefits and privileges on account of one's speech do not give rise to a First Amendment claim. . . .  [E]ven if the Board's intent was to play political hardball in response to Blair's advocacy, his authority as a member of the Board was unaffected; despite his removal as Board vice president, he retained the full range of rights and prerogatives that came with having been publicly elected." *Id.* at 544.  The court also cited, with approval, *Zilich v. Longo*, 34 F.3d 359 (6th Cir. 1994), in which the Sixth Circuit rejected a § 1983 First Amendment retaliation claim against "city council members who passed a resolution stating that an outgoing council member who had been a thorn in their side had never been qualified to hold office." *Blair*, 608 F.3d at 546.  The court explained that "Blair's removal from the titular position of Board vice president is, for First Amendment purposes, analogous to the condemning resolution in *Zilich* and . . . [that] decision[] support[s] our conclusion here." *Id.*[14]  "To be sure, the First Amendment protects Blair's discordant speech as a general matter; it does not, however, immunize him from the political fallout of what he says." *Id.* at 542.

During oral argument, Plaintiff sought to distinguish *Wilson* and *Blair* on the ground that they involved less significant sanctions and less pervasive patterns of retaliation than this case involves.  Plaintiff also identified *Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022)—a case not cited in his motion papers—as the best case supporting his position. Due to the untimely nature of this citation, the Court authorized Defendants to file a post-argument supplemental brief concerning *Boquist*, which they have now done.  (Doc. 39.)

Although *Boquist* provides more support for Plaintiff's position than any of the

---

[14]     In his reply, Plaintiff seeks to distinguish *Zilich*, which Defendants cite in their response (Doc. 24 at 13), on the ground that it merely involved "words" of criticism against a former city council member, whereas this case involves "actual punishment" against a sitting member of the Town Council consisting of "significant discipline imposed." (Doc. 28 at 8, emphases omitted.)  But this distinction is unavailing in light of *Blair*, which holds that the censure at issue in *Zilich* had the same First Amendment significance as the decision to strip Blair, a sitting board member, of his internal role as vice president (which is akin to Defendants' decision to discipline Plaintiff by not allowing him to serve as Vice Mayor).

authorities cited in his motion papers, it is too factually dissimilar to warrant the extraordinary remedy of preliminary injunctive relief.  There, an Oregon state senator (Boquist) who was a member of the minority party walked out of the senate to prevent a quorum, and when members of the majority party threatened to have him arrested, he told a reporter in colorful terms that he would resist any such arrest attempt.  *Boquist*, 32 F.4th at 771.  In response, members of the majority party informed Boquist that he might be the subject of a "censure and bar" and then issued a rule requiring Boquist "to give at least twelve hours advance notice in writing to the Secretary of the Senate before he intended to visit the State Capitol."  *Id.* at 773.  Boquist, in turn, brought a § 1983 First Amendment retaliation action against various members of the majority party.  *Id.*  The district court dismissed the § 1983 claim for failure to state a claim but the Ninth Circuit reversed.  As for the "materially adverse action" element of Boquist's prima facie case, the court explained that "[n]either *Wilson* nor *Blair* held that an adverse action against an elected official could never be sufficiently material to raise an actionable claim for First Amendment retaliation."  *Id.* at 776.  The court also emphasized that in both of those cases, the selected sanction did not prevent the plaintiff from "doing his job" or deprive the plaintiff of the "authority he enjoyed by virtue of his popular election."  *Id.* at 783 (cleaned up).  In contrast, the court held that the 12-hour requirement directly "inferfere[d] with Boquist's ability to meet with constituents, elected officials, and others at the State Capital Building on short notice, and therefore prevents Boquist from doing his job."  *Id.* at 784 (cleaned up).  The court also noted that "[t]he advance notice requirement eliminates the possibility of spontaneous speech, including a senator's ability to immediately respond to and address a political issues arising on the floor of the Oregon state senate."  *Id.* at 783 (cleaned up).  For these reasons, the court held that the 12-hour requirement was akin to "the expulsion or exclusion of elected officials due to their protected speech," which the Supreme Court recognized to be an impermissible legislative sanction in *Bond v. Floyd*, 385 U.S. 116 (1966).  *Id.* at 782.  The court also emphasized that, although "[l]egislatures have historically exercised the power to expel their members, as well as to discipline them

- 14 -

through the use of censures, reprimands, and fines," there is no historical tradition of legislatures "bar[ring] an elected member from the legislative chamber (whether temporarily or permanently)." *Id.*  To the contrary, the court stated that "the prevailing view is that members of the legislature do not have the power to suspend members and therefore deprive them of the right to vote." *Id.* at 783.

In the Court's view, this case is much closer to *Wilson* and *Blair* than it is to *Bond* and *Boquist*.  In *Wilson* (verbal censure) and *Blair* (removal from vice-president position), the selected sanction did not prevent the plaintiff from carrying out his job as a legislator or otherwise deprive the plaintiff of the authority he enjoyed by virtue of his popular election.  Similarly, the four sanctions at issue here—precluding Plaintiff from holding the rotating position of Vice Mayor, not allowing Plaintiff to interact with Fountain Hills staff members without another person present, requiring Plaintiff to apologize to Luchese, and barring Plaintiff from seeking reimbursement for certain travel expenses—are only "de minimis deprivations of benefits and privileges," *Blair*, 608 F.3d at 544, that do not preclude Plaintiff from continuing to attend Town Council meetings, engage in spontaneous speech, meet with constituents, and cast votes.[15]  In contrast, the selected sanctions in *Bond* (exclusion from the legislature) and *Boquist* (advance-notice requirement that functionally operated as temporary exclusion) both had the effect of preventing the plaintiff from performing the basic functions of his legislative position.  *Boquist*, 32 F.4th at 783 ("The 12-hour notice rule therefore prevents Boquist from exercising authority he enjoyed by virtue of his popular election, namely, having timely access to the physical seat of government where governmental debates take place.") (cleaned up).

With that said, the Court acknowledges that this case is not fully controlled by *Wilson* and *Blair*.  Even though, as explained above, the Court views the four sanctions at

---

[15]   Although these sanctions may seem petty or heavy-handed, this does not mean they are actionable under the First Amendment in the unique context of intra-legislative sanctions.  *Lathus v. City of Huntington Beach*, 56 F.4th 1238, 1240-41 (9th Cir. 2023) ("[O]ur statement in *Blair* that more is fair in electoral politics than in other contexts is best understood as pertaining to the retaliatory acts of elected officials against their own.") (cleaned up).

issue here as imposing only *de minimis* deprivations of the benefits and privileges of office, they still go beyond the more limited sanctions at issue in *Wilson* and *Blair*. Additionally, one part of the analysis when evaluating whether an intra-legislative sanction is actionable under the First Amendment is whether "similar sanctions were traditionally part of legislative action." *Boquist*, 32 F.4th at 782. Although the parties have made no attempt to provide such a historical analysis here, the Court is skeptical that at least one of the sanctions (the forced apology) is part of a long-settled and established historical practice.[16] Nevertheless, despite these caveats, the bottom line is that Plaintiff is the party with the heavy burden of establishing an entitlement to the extraordinary remedy of a preliminary injunction. Because Plaintiff fails to cite any case upholding the imposition of § 1983 liability against a member of a municipal legislative body (or the municipality itself) under remotely similar circumstances, the two primary authorities on which Plaintiff relies (*Bond* and *Boquist*) are distinguishable, and the more factually comparable cases (*Wilson* and *Blair*) tend to undermine the validity of Plaintiff's claim, Plaintiff has not met that burden.

## B.   **Legislative Immunity**

Although the foregoing analysis is alone sufficient to show why Plaintiff's request for a preliminary injunction must be denied, Plaintiff's claims also face another potential hurdle—the doctrine of legislative immunity.[17]

---

[16]     The apology sanction was the subject of a fair amount of discussion during oral argument. To the extent Plaintiff argues it is separately actionable from the remaining sanctions because it amounts to compelled speech, the Court is unpersuaded. To date, Plaintiff has refused to apologize, as is his prerogative. If the Town Council were, in the future, to impose an *additional* sanction against Plaintiff based on his refusal to apologize, and that sanction qualified as a materially adverse action that prevented Plaintiff from carrying out his job, the analysis might be different, but those hypothetical facts are not the facts here.

[17]     Although *Blair* and *Boquist*, the Ninth Circuit's leading cases in this area, contain no discussion of the concept of legislative immunity, the Court does not construe this silence as an implicit rejection of the doctrine. *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1231 (10th Cir. 2004) ("[C]ases are not authority for propositions not considered.") (internal quotation marks omitted). Indeed, in *Boquist*, the Ninth Circuit emphasized that due to the posture of the case—Boquist's appeal arose from the grant of a motion to dismiss under Rule 12(b)(6)—it was not considering any affirmative defenses the defendants might be able to raise. *Boquist*, 32 F.4th at 772 (explaining that, on remand, "[t]he senate majority members . . . will have an opportunity to raise affirmative defenses"); *id.* at 774 ("Ordinarily affirmative defenses may not be raised by motion to dismiss.") (cleaned up). The posture of the case is different—Plaintiff must show a likelihood of

In *Whitener v. McWatters*, 112 F.3d 740 (4th Cir. 1997), an ethics complaint was filed against Whitener, a member of the Loudoun County Board of Supervisors, for engaging in "unseemly behavior" and using "abusive language" during conversations with other board members. *Id.* at 741. Similar to this case, the complainants asserted that "Whitener's conversations with them exceeded the bounds of decency and civility." *Id.* Similar to this case, the complaint prompted an investigation, and then a hearing, and then a vote by the board of supervisors to discipline Whitener by censuring him and removing him from all of his committee assignments for one year. *Id.* ("[T]he Board voted 8-1 to censure Whitener and 5-4 to strip him of his committee assignments for a period of one year."). Similar to this case, Whitener then filed a § 1983 action against the board members who had voted to censure and discipline him, arguing that they "violated his First Amendment . . . rights," but the district court dismissed the lawsuit and the Fourth Circuit affirmed, holding that "the Board members enjoyed absolute legislative immunity" because "a legislative body's discipline of one of its members is a core legislative act." *Id.* at 741-42. In reaching this conclusion, the court acknowledged that Whitener "was arguably disciplined for speech" that is protected by the First Amendment "from executive or . . . judicial interference," but it emphasized that such speech is "not [protected] from the legislative body's judgment," and indeed "the exercise of [legislative] self-disciplinary power" is "protected by absolute immunity." *Id.* at 744. The court also distinguished *Bond*, which it viewed as "not undermin[ing] the well-established principle that legislatures may discipline members for speech with the corollary immunity from executive or judicial reprisal for doing so." *Whitener*, 112 F.3d at 744. The court continued: "Whitener seeks to transform the narrow holdings of *Bond* and [other cases] to imply that legislative censure is unconstitutional if motivated by something the member said. But he provides no authority for the proposition, and long practice indicates otherwise." *Id.* at 745.

Likewise, in *Sorcan v. Rock Ridge School District*, 2024 WL 230081 (D. Minn.

---

success on the merits, which includes an ability to overcome the affirmative defense of legislative immunity that Defendants have raised. (Doc. 24 at 15.)

2024), a member of a municipal school board named Sorcan "repeatedly questioned and commented on the District's business, supported and opposed strategies and actions related to the District's business, and advocated for positions such as fiscal discipline." *Id.* at *1. The school board, in turn, "issued a censure against Sorcan," removed her from certain committee assignments, and barred her from attending certain committee meetings. *Id.* Believing these actions were "in retaliation for her political advocacy," Sorcan brought a § 1983 action against Addy, the chair of the school board, arguing as relevant here that Addy had "violated her First Amendment right to free speech and expression." *Id.* The district court dismissed the § 1983 claim against Addy, explaining that "state legislators are absolutely immune from suit under Section 1983 for actions in the sphere of legitimate legislative activity," that "[t]he Supreme Court subsequently extended this immunity to include . . . local officials," and that Addy qualified for absolute immunity under this line of authority because "a governing council's discipline of one of its members [is] a core legislative act that does not pose a First Amendment concern." *Id.* at *2-3 (cleaned up). The court acknowledged that "the School Board's action is not quintessentially legislative and lacks the characteristics of a legislative act when compared to [such examples] as the introduction of a budget or signing into law an ordinance," but it held that because "the censure nonetheless was self-disciplinary and did not result in the termination of Sorcan's employment," "the act was legislative in nature." *Id.* at *4.

And again, in *Furstenau v. City of Naperville*, 2009 WL 10741784 (N.D. Ill. 2009), the plaintiff, Furstenau, was a member of the Naperville City Council. *Id.* at *1. During his tenure as a member of the city council, Furstenau engaged in various forms of speech that would ordinarily be protected by the First Amendment, such as criticizing various policies of the Naperville Police Department and accusing other city officials of misconduct. *Id.* Afterward, two other city officials, Burchard and Ely, allegedly "retaliated against Furstenau by, among other actions, . . . orchestrating his censure." *Id.* Furstenau then brought a § 1983 action in which he, among other things, asserted a First Amendment retaliation claim against Burchard and Ely. *Id.* at *2. The district court dismissed,

concluding that "Burchard and Ely are protected from Furstenau's additional First Amendment retaliation claims by legislative immunity" because "any attempts they made to censure Furstenau" "fall under the umbrella of legislative activity." *Id.* at *5-6.

Because legislative immunity in this context is enjoyed by both state and local legislators, s*ee generally Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (explaining that "state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities" and that "local legislators are likewise absolutely immune from suit under § 1983 for their legislative activities"), the decision in *Chase v. Senate of Virginia*, 539 F. Supp. 3d 562 (E.D. Va. 2021), provides yet another example of a precedent undermining Plaintiff's position. There, a Virginia state senator named Chase "attended a political rally in Washington, D.C." on January 6, 2021 and exhorted the crowd "to urge that action be taken to overturn" the 2020 presidential election. *Id.* at 565. The Virginia Senate, in turn, eventually voted "to censure Chase for a series of eight incendiary incidents spanning from March 22, 2019 to early 2021 . . . all premised on statements made by Chase (*i.e.*, speech)." *Id.* at 566 (cleaned up). "As a consequence of" the censure, Chase was "demoted to a rank equivalent to that of a newly elected Senator" and "relieved of all previous committee assignments." *Id.* Chase, in turn, brought a § 1983 First Amendment retaliation lawsuit against the Virginia Senate and the clerk of the Virginia Senate. *Id.* at 566-67. The district court dismissed, concluding along the way that "had [any] individual senators been named in this suit, they would have been entitled to absolute legislative immunity" under *Whitener*. *Id.* at 569-71. This was so, the court explained, because "a legislature's discipline of its own members is a core legislative act . . . even where a plaintiff alleges violations of his or her First Amendment and Fourteenth Amendment Due Process rights" and even if the plaintiff "was being censured for her political views rather than her lack of civility." *Id.*

Councilwoman Kalivianakis, Councilwoman Grzybowski, and Councilwoman McMahon all appear to be covered by these principles because they are being sued in their capacities as members of the Town Council for their decision to discipline a fellow

- 19 -

1  councilmember.  Additionally, although Mayor Dickey might be considered a member of

2  the executive branch in other contexts, she is being sued here for her legislative activity as

3  a member of the Town Council.  As for Attorney Vannucci, even assuming she "acted

4  under color of law . . . at all relevant times" (Doc. 1 ¶ 6) for the reasons Plaintiff's counsel

5  identified during oral argument, she would share in the legislative immunity of the

6  legislators she was assisting.  *Cf. Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 507

7  (1975) ("Since the Members are immune because the issuance of the subpoena is 'essential

8  to legislating,' their aides share that immunity.").  Finally, *Wilson* seems to preclude any

9  claim against Fountain Hills under these circumstances and Plaintiff does not, at any rate,

10  attempt to explain how Fountain Hills could be held liable where he has failed to establish

11  that any individual Fountain Hills official violated his First Amendment rights.  *See, e.g.,*

12  *Quintanilla v. City of Downey*, 84 F.3d 353, 355-56 (9th Cir. 1996) (rejecting *Monell* claim

13  because "Plaintiff failed to establish that he suffered a constitutional injury").  *Cf. Sorcan*,

14  2024 WL 230081 at *4 (rejecting claim against school district after rejecting claim against

15  individual board member).

16  Accordingly,

17  **IT IS ORDERED** that Plaintiff's motion for preliminary injunction (Doc. 6) is

18  **denied**.

19  Dated this 29th day of August, 2024.

Dominic W. Lanza
United States District Judge

- 20 -